# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Norristown Academy Charter School   :
  :
  :
  :
       v.                :      No. 745 C.D. 2023
  :      Argued: October 10, 2023
Norristown Area School District,   :
            Appellant   :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: November 17, 2023


Norristown Area School District (the District) appeals the Memorandum Order filed on June 26, 2023 (Memorandum Order) by the Court of Common Pleas of Montgomery County (trial court) granting Norristown Academy Charter School's (Applicant) Petition to Appeal Denial of Charter School Application (Petition) and directing that Applicant may file an appropriate appeal on the merits pursuant to Section 1717-A(i)(2) of the Charter School Law (CSL).[1] Also before this Court is Applicant's Application to Quash Appeal (Application to Quash), wherein Applicant alleges the Memorandum Order was not a final order as defined by Rule 341(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 341(b). Following our review, we deny Applicant's Application to Quash and affirm the Memorandum Order.

---

[1] The CSL is part of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, added by the Act of June 19, 1997, P.L. 225, 24 P.S. § 17-1717-A(i)(2).

## I.  BACKGROUND

The relevant factual and procedural background herein, gleaned from the trial court's Memorandum Order, this Court's previous Memorandum Opinion in *Norristown Academy Charter School v. Norristown Area School District* (Pa. Cmwlth., No. 745 C.D. 2023, filed Sept. 7, 2023) (Cohn Jubelirer, PJ.) (single-judge op.) (*Norristown Acad. I*), the parties' respective filings, and the notes of testimony, are as follows.  In November 2019, Applicant submitted its application (the application) to the District wherein it sought approval of its plan to operate a charter school in Norristown Borough, Montgomery County.  *Norristown Acad. I*, slip op. at 2.  As is required by the CSL, the District held a public hearing on the application on December 9, 2019, and on February 18, 2020, the school board of directors voted to deny the same.  (Memorandum Order at 2.)  Applicant then submitted a revised application,  which was also denied in August 2020.  (*Id.* at 2-3.)

In order to appeal the denial of the application to the Charter School Appeal Board (CAB), under the CSL, Applicant had to obtain 1,000 signatures of District residents.  24 P.S. § 17-1717-A(i)(2).  Applicant obtained 1,649 signatures and filed its Petition with the trial court.  In ruling on a motion *in limine*, the trial court struck some of the signatures, leaving 1,041 signatures.  With regard to the District's remaining objections, the trial court scheduled a number of hearings at which David Hall, the District's primary signature collector, and Desiree N. Maguire, the resident affiant required by the CSL, testified.  Mr. Hall testified regarding the process used by him and an assistant, Kevin Jones, to obtain signatures and later was recalled as a witness, at which time he clarified some of his earlier testimony related to the number of signature assists, meaning someone other than the signer completed some

2

or all of the requisite information on the Petition. (*Id*. at 5; Notes of Testimony (N.T.) January 18, 2023, at 1-17.) Ms. Maguire testified as to her involvement with the Petition. (*Id*. at 5.) The parties also presented the testimony and report of a privately retained handwriting expert and the District's chief financial officer (CFO).

Considering the evidence and arguments presented at the hearings, the trial court granted the Petition, permitting Applicant to file an appeal on the merits of the revised application with the CAB. (*Id*. at 8, 33; *Norristown Acad*. *I*, slip op. at 3.) The trial court first determined that the expert testimony and reports did not demonstrate that the number of valid signatures was below 1,000. (Memorandum Opinion at 8-9.) The trial court found most of District's objections related to signatures associated with allegedly defective addresses were "trivial . . . rather than being based upon any genuine confusion or uncertainty regarding the address the signer intended to convey." (*Id*. at 14, 18-19.) The trial court also found no merit to the District's "grossly misstate[d]" claims that the number of signature assists rendered every signature collected on the Petition invalid. (*Id.* at 8, 23.) Finding Mr. Hall's testimony credible, the trial court determined that on the "relatively few times" signers were assisted in signing the Petition, which was "limited to a mere 29 signatures[,]" Mr. Hall or Mr. Jones would place an "SA" "in the margin" to designate a "signature assist." (*Id*. at 22-23, 25.) Finally, the trial court held that Ms. Maguire's affidavit attached to the Petition, the substance of which her testimony confirmed, satisfied the requisite elements of the CSL. (*Id*. at 26-27.) Specifically, the trial court found Ms. Maguire was a resident of the District, reviewed the signatures with Messrs. Hall and Jones weekly, and, at times, observed their interactions with the signers. (*Id*. at 27-28.) Further, prior to signing the

affidavit, the trial court found Ms. Maguire reviewed all of the signatures in the Petition and intended her signature to cover them. (*Id*. at 28.)

The District filed a notice of appeal, thereby triggering an automatic supersedeas of the Memorandum Order pursuant to Pa.R.A.P. 1736(b). As a result, Applicant filed an emergency motion to vacate the automatic supersedeas in the trial court, which the trial court granted. Thereafter, the District filed its application seeking reinstatement of its automatic supersedeas, which this Court granted pending final disposition. In the interim, Applicant filed the Application to Quash asserting this Court lacks jurisdiction because the trial court's Memorandum Order is not a final order under Rule 341(b)(1). Applicant also filed a separate appeal before the CAB.

After expediting this matter, the Court heard oral argument on October 10, 2023, on the appealability of the Memorandum Order and signature requirements of the CSL, and this matter is now ready for disposition.[2] On appeal, the District argues the Memorandum Order is dispositive of all claims for all parties in the trial court. The District also posits that the entire Petition is invalid due to the repeated violations in the signature gathering process and errors in the addresses affixed thereto. The District also claims the trial court abused its discretion in basing its decision on personal experience rather than record evidence. Applicant asserts the Court lacks jurisdiction because the Memorandum Order is not a final, appealable order. Because, generally, a litigant may appeal only from a final order, *see*

---

[2] On October 17, 2023, Applicant filed an Application for Post-Submission Communication (Post-Submission Application), which the District opposes, seeking to alert the Court that shortly after oral argument, CAB quashed Applicant's appeal based on this Court's reinstatement of the automatic supersedeas. We grant the Application and consider the Post-Submission Application to the extent it is relevant.

4

Pa.R.A.P. 341(a), we first consider whether the Memorandum Order was a final order as it implicates this Court's jurisdiction.

## II. DISCUSSION

### A. Whether the Trial Court's Memorandum Order is Final and Appealable.

#### 1. *Parties' Arguments*

Applicant argues that the Memorandum Order "does not adjudicate anything concerning the merits[,]" but rather, is simply "the first step in the multi-tiered review process" under the CSL, which allows the litigation before the CAB to proceed and is "unappealable to this Court until after the [CAB] decides the appeal." (Applicant's Brief (Br.) at 1, 13-14, 16-17, 19.) Applicant reasons that delaying the Court's consideration of this appeal until after the CAB issues an order on the merits is both in line with the CSL's interest in resolving appeals expeditiously and the Commonwealth's "strong policy against piecemeal appeals" and unnecessary delay. (*Id*. at 14, 26-27.) Applicant states that deferring what is essentially a jurisdictional objection until after the CAB resolves the merits means this Court will more efficiently decide a given matter only one time. (*Id*. at 26-27.) Applicant posits that this appeal will "upset[] and substantially delay[] what is supposed to be a speedy administrative review" while "immediate review by the CAB, without an intervening appeal to this Court, increases the likelihood of a more efficient, uninterrupted administrative review, consistent with the strict timeliness written into the CSL." (*Id*. at 28-30.)

Applicant acknowledges this Court previously concluded that a trial court order allowing an appeal to the CAB is a final order, *see In re Applicants for Academy of Business & Entrepreneurship Charter School* (Pa. Cmwlth., Nos. 221

5

& 1033 C.D. 2016, filed Mar. 21, 2017) (*Academy of Business*), slip op. at 7-8.[3] Applicant urges us not to follow that unreported decision, contending that in *Academy of Business*, this Court applied the "out of court" test, which was utilized prior to the 1992 amendment to Rule 341, when discerning if an order was final, and Rule 341 presently requires a final order to end litigation of all claims concerning all parties.[4] (Applicant's Br. at 20-21.) Analogizing the CSL procedure to orders in the courts of common pleas compelling arbitration, Applicant argues the instant proceeding and that before the CAB are "inextricably linked" for

> [i]f a proposed charter school does not succeed in the [c]ourt of [c]ommon [p]leas, it is precluded from going to [the] CAB. And if the proposed charter school does succeed in the [c]ourt of [c]ommon [p]leas, the dispute between the district and the charter school is not resolved. Instead, the charter school just gets the opportunity to pursue its arguments on the merits. In no circumstances are the parties "out of court" on the issue of the sufficiency of [Applicant's] [P]etition.

(*Id*. at 23-25.)

In response, the District points out that the only issue before the trial court was whether the Petition is supported by the requisite number of signatures to afford Applicant the right under the CSL to appear before the CAB; thus, as the trial court decided that issue, the Memorandum Order is final as it resolved the only claim in

---

[3] Pa.R.A.P. 126 provides that single-Judge opinions of this Court that do not involve an election law matter, "even if reported, shall be cited only for persuasive value and not as binding precedent." Pa.R.A.P. 126(c)(2). Section 414(b) of this Court's Internal Operating Procedures provides that "[e]xcept as provided in subsection (d) (relating to single-Judge opinions in election law matters), a single-Judge opinion of this Court, even if reported, shall be cited only for its persuasive value and not as a binding precedent." 210 Pa. Code § 69.414(b).

[4] The 1992 amendment to Rule 341 generally eliminated appeals as of right from orders that did not end litigation as to all claims and as to all parties. Prior thereto, courts determined an order to be final "if it had the practical effect of putting a party out of court, even if the order did not end the litigation as to all claims and all parties." Pa.R.A.P. 341, Note.

6

the proceeding before the trial court. (District's Br. at 22.) The District contends that the analysis employed in *Academy of Business* controls the issue of the appealability of the Memorandum Order, and this Court should reject Applicant's arguments to the contrary. The District distinguishes arbitration from a CSL proceeding, in that parties engaged in the arbitration process litigate the same issues throughout, while in a CSL proceeding "the parties are put out of court on the sufficiency of the petition after the [c]ourt of [c]ommon [p]leas decides the issue." (*Id*. at 23-24.)

### 2.    *Analysis*

Rule 341(b)(1) defines a "final order," in relevant part, as any order that "disposes of all claims and of all parties." Pa.R.A.P. 341(b)(1). In analyzing whether the Memorandum Order is a final order in the context of the CSL, we are mindful that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). "The plain language of the statute is the best indicator of the legislature's intent. To ascertain the plain meaning, we consider the operative statutory language in context and give words and phrases their common and approved usage." *Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934, 942 (Pa. 2021) (citation omitted).

Section 1717-A(i)(1) of the CSL states that the "[CAB] shall have the exclusive review of an appeal by a charter school applicant, or by the board of trustees of an existing charter school, of a decision made by a local board of directors not to grant a charter as provided in this section." 24 P.S. § 17-1717-A(i)(1). However, as we discussed in our prior memorandum herein,

7

> The CSL dictates [the] procedure for the enactment of charter schools, which begins with an application to the local board of school directors in the location of the proposed charter. *See* Section 1717-A(c) of the CSL, 24 P.S. § 17-1717-A(c). Following receipt of the application, and after a public hearing, the local school board of directors issues an approval or denial. *See* 24 P.S. §17-1717-A(d)-(e)(1). Uniquely, an aggrieved applicant does not have automatic access to appeal an application denial to the . . . []CAB[] under the CSL. Rather, **appeal eligibility hinges upon satisfaction of the following prerequisite**. Pursuant to the CSL, within 60 days of application denial, an applicant must obtain the signatures of at least 2% of school district residents ***or*** of 1,000 school district residents over the age of 18, whichever number is less. *See* 24 P.S. § 17-1717-A(i)(2). **It is only once the applicant fully satisfies the signature requirement of Section 1717-A(i)(2) of the CSL, that it may proceed with an appeal to the CAB**. []*Id.*[]

*Norristown Acad. I*, slip op. at 1-2 (some emphasis added). Thus, a charter school applicant initially must prove the validity of those signatures, *i.e.*, that there is sufficient community support for the charter school, before a school district is called upon to expend time and taxpayers' money to defend its denial of an application before the CAB.

We employed an analysis of the CSL in *Academy of Business* to address the finality of a trial court order under Section 1717-A(i)(1). Therein, this Court was called upon to consider, *inter alia*, the school district's appeal following the trial court's holding that the charter school had submitted in excess of the required 1,000 valid signatures to submit its petition to certify an appeal to the CAB (2015 Order). The parties filed post-trial motions, but before the trial court could rule thereon, the school district filed an appeal of the 2015 Order. At this Court's direction, the trial court ultimately filed a second order disposing of the post-trial motions and, upon reconsidering its earlier decision, found that the charter school had not submitted the

8

requisite number of signatures (2016 Order). The charter school filed an appeal from the 2016 Order.

The first procedural issue this Court considered was whether the school district's appeal of the 2015 Order or the charter school's appeal of the 2016 Order was before us. In doing so, we noted that the charter school had argued we lacked jurisdiction over the 2015 Order because it was not a final order under Rule 341(b)(1), in that it "did not put the parties out of court but rather move[d] the appeal to the next stage in the process-review by the CAB." *Acad. of Bus.*, slip op. at 7. Relying on this Court's previous review of similar appeals in *Capital Academy Charter School v. Harrisburg School District*, 934 A.2d 189 (Pa. Cmwlth. 2007), and in *In re: Petition to Appeal the Denial of the Charter School Application of Roberto Clemente Elementary Charter School* (Pa. Cmwlth., No. 413 C.D. 2012, filed August 10, 2012), wherein we reviewed trial court orders regarding the sufficiency of petitions without questioning our jurisdiction to do so, the school district in *Academy of Business* argued that the 2015 Order was "final and immediately appealable to this Court, as the CAB could not review the decision of common pleas regarding the sufficiency of the signatures." *Acad. of Bus.*, slip op. at 7.

This Court agreed with the school district that under the CSL, the CAB only reviews a decision made by a local board of school directors. As we explained:

> [T]he 2015 Order is a final order. Under the CSL's scheme, a charter school appeal petition filed in common pleas is a separate action from a charter school application, and the CAB may only review a school board's decision on a charter school application. *See* 24 P.S. § 17-1717A(i)(6) (providing that "*the decision made by the local board of directors* shall be reviewed by the appeal board on the record as certified by the local board of directors" (emphasis added)). Thus, because the proceeding on the charter school appeal petition is a

9

> separate action from the appeal of the charter school application to the CAB, the 2015 Order addressing the charter school appeal petition was final and appealable to this Court.

*Acad. of Bus.*, slip op. at 8 (emphasis in original).

We find our analysis in *Academy of Business* persuasive here. Although Applicant argues that this Court lacks jurisdiction over the Memorandum Order because the Memorandum Order does not make a determination on the merits of the Petition, the trial court's decision herein is the initial step in the review process of a charter school application under the CSL. Under the CSL, the trial court's determination on the **procedural question** of whether the requisite number of signatures have been obtained **is separate** from the appeal before the CAB pertaining to the **merits** of the District's denial of the charter school application. The plain language of the CSL prescribes this two-tiered approach, and for this Court to hold otherwise would require ignoring the plain terms of the CSL. There is no presumption in the CSL that signatures on a petition are valid, and the CSL affords a charter school applicant the right to appeal a school board's denial of a charter to the CAB only where the applicant can demonstrate sufficient evidence of community support through resident signatures for an appeal. 24 P.S. § 17-1717-A. Further, a contrary holding would complicate this Court's appellate review as it would require us to simultaneously review and interpret both the trial court and the CAB records, which are necessarily different in substance and source; only once the prerequisite determination is made regarding Applicant's compliance with the CSL's signature requirements may a merits review commence before the CAB. For these reasons, we conclude that our analysis in *Academy of Business* is persuasive on this issue, and we adopt it herein to find the Memorandum Order is a final order.

10

Accordingly, the Application to Quash is denied, and we turn to a consideration of the merits of the District's appeal.

      *B.      Whether There Were an Unknowable Number of Illegally Assisted Signatures Affixed to the Petition.*

Because the issues presented pertaining to the signature requirements of the CSL require the interpretation of a statute, this Court's review is plenary. *Cap. Acad.*, 934 A.2d at 192 n.3 (citation omitted). The District's challenges to the validity of signatures, which may have been assisted or are accompanied with erroneous addresses, are "question[s] of fact that this Court will not disturb absent an abuse of discretion or error of law." *Id.* at 195 (footnote omitted).

      *1.      Parties' Arguments*

The District contends that the Petition is void in its entirety due to "pervasive flaws" in the signature collection process. (District's Br. at 24.) According to the District, the CSL requires that only signers of a petition are permitted to execute the petition and must enter **all** information in their own hand thereon, including their printed name, complete address, and the date of signing; any indication that this information was the result of assistance from a signature gatherer or family member renders the signature invalid. (*Id.* at 24-25.) The District acknowledges that only 29 signatures were marked as having been obtained with the assistance of the signature gatherers but argues that the trial court "completely ignored" the "unmistakable" testimonial evidence regarding "[t]he casual nature of signature assists" that occurred in this matter and the uncertain number of the signatures that were the product of this process, which necessarily casts doubt on the entire Petition. (*Id.* at 16, 24-27.) For instance, the District points to the testimony of Mr. Hall, when asked whether he knew if it is legal to assist individuals with filling out a

11

charter school petition, to which he responded that while he could not speak to the legality of the practice, he knew it was "a common practice in signature gathering." (*Id.* at 25 (citing Reproduced Record (R.R.) at 1939a).)

The District also argues the trial court committed reversible error in ignoring evidence that there were an unknown number of signatures obtained with the help of family members, and these "family assists" are not permissible under the CSL. (*Id.* at 26-28.) The District contends Mr. Hall viewed the need to label assisted signatures as "a mere voluntary informality rather than a strict legal necessity," which evinces the Petition is replete with illegal signatures. (*Id.* at 25-26.) Herein, the District posits that Section 1717-A(i)(3) and this Court's interpretation thereof in *Academy of Business* require that all information associated with signatures must be in a signer's own hand. Relying upon testimony of Mr. Hall that signature assists commonly occur in signature gathering and his description of a hypothetical scenario in which a family assist may occur, (R.R. at 1882a-84a), the District argues that the Petition contains an "unknown, and unknowable, number of illegally collected signatures." (District's Br. at 27.)

Conversely, according to Applicant, the plain language of Section 1717-A(i)(3) does not require one to fill out the signature line in his or her own hand, so long as the writer is authorized to do so on the signer's behalf. (Applicant's Br. at 37.) Notwithstanding, Applicant argues the trial court correctly determined the District has mischaracterized Mr. Hall's testimony at the hearings and properly found that when either he or his colleague, Mr. Jones, assisted a signer with the information set forth in the Petition, which occurred only 29 times, they noted a "signature assist" or "SA" next to the individual's information. (*Id.* at 38-40.) Applicant explains that while the District relies on statements Mr. Hall made during

12

his November 15, 2022 testimony, he clarified his actions on January 18, 2023, and the trial court found that Mr. Hall's complete testimony did not call into question every signature he and Mr. Jones had collected. (*Id.* at 42-43.) Applicant further states that the record is devoid of evidence that family members regularly assisted signers, and any testimony of such assistance was speculation by Mr. Hall when Mr. Hall was asked why the District's handwriting expert may have identified some signature lines as appearing to have been made by the same individual. (*Id*. at 44-46.)

Applicant also posits that this Court's jurisprudence recognizes a signature may be deemed valid notwithstanding "technical noncompliance with the CSL" where there is no evidence of fraud by the charter school applicant and the evidence shows the school district understood the signer's intent. (Applicant's Br. at 32-33.) Applicant avers that the District's attempt to assert a "global" challenge to every signature on the Petition in light of 29 expressly marked signature assists must fail in light of the record evidence. (*Id*. at 15, 34-35.) Alternatively, Applicant posits that the General Assembly's use of the word "include" in Section 1717-A(i)(3) of the CSL does not suggest that signers must directly and personally provide this information on a petition if they authorize another individual to do so on their behalf. (*Id*. at 37-38.) Applicant further states that the record is devoid of evidence that family members actually assisted signers and reasons that, even if undocumented signature assists had occurred, such a practice was not precluded by the CSL or this Court's decision in *Academy of Business*. Applicant points out that, notwithstanding, in an abundance of caution, the trial court excluded all 103 signatures identified in the expert's report as possibly having been completed by the same hand. (*Id*. at 44-47.)

13

2. *Analysis*

Section 1717-A(i)(2) of the CSL provides:

> In order for a charter school applicant to be eligible to appeal the denial of a charter by the local board of directors, the applicant must obtain the signatures of at least two per centum of the residents of the school district or of one thousand (1,000) residents, whichever is less, who are over eighteen (18) years of age. . . . The signatures shall be obtained within sixty (60) days of the denial of the application by the local board of directors in accordance with clause (3).

24 P.S. § 17-1717-A(i)(2). Pursuant to Section 1717-A(i)(3) of the CSL,

> **[e]ach person signing a petition** to appeal a denial of a charter under clause (2) **shall declare** that he or she is a resident of the school district which denied the charter application **and shall include his or her printed name; signature; address, including city, borough[,] or township, with street and number, if any; and the date of signing**.

24 P.S. § 17-1717-A(i)(3) (emphasis added).

In *Academy of Business*, the school district challenged a charter school petition arguing the invalidity of signatures. Following multiple hearings, the trial court issued an order finding the applicant had obtained the requisite number of valid signatures. However, upon reconsideration after post-trial motions, the trial court invalidated several hundred signatures, which brought the total below the requisite 1,000, and the applicant appealed. Relevant herein, the applicant argued the trial court's decision to strike signatures where the only error was the signer's failure to personally include the date was contrary to and did not serve the purpose of the CSL. *Acad. of Bus.*, slip op. at 14. Applying rules of grammar and analyzing the sentence structure of the portion of Section 1717-A(i)(3) providing "each person signing a petition . . . *shall include* . . . ," we determined that the General Assembly's use of the active voice indicated its intent to put "the responsibility to place or list the date of signing on the petition on the person signing the petition." *Id.*, slip op. at 15-17

14

(footnote omitted) (italics in original). Also, we reasoned that "because the General Assembly used the word 'shall' in Section 17[17]-A(i)(3)," the inclusion of the date of signing on a petition is a mandatory responsibility. *Id.*, slip op. at 18. We found this interpretation to be

> consistent with our holding in *Capital Acad*emy[, where] we held that a signature to a charter school appeal petition is not rendered invalid under Section 17[17]-A(i)(3) of the CSL when a signer includes "ditto marks" on the petition instead of his or her complete address because no fraud or deceit was alleged against the charter school and the testimony showed that school district understood what the ditto marks were intended to convey. *Cap*[.] *Acad.*, 934 A.2d 196.

*Acad. of Bus.*, slip op. at 18.

However, upon noting that there were no allegations in *Capital Academy* that anyone but the signer had made "ditto marks" in lieu of a complete address, this Court stated that this interpretation did

> not shed definitive light on whether the signer must include the date of signing *in his or her own hand*, or whether a signer may indirectly "include" (i.e., place, list, or take in) the date on the petition by authorizing the date to be placed on the petition by someone else.

*Id.*, slip op. at 17 n.10 (emphasis in original).

This Court subsequently adopted this analysis in *Berks Arts Academy Charter School v. Board of Directors of Reading School District* (Pa. Cmwlth., No. 447 C.D. 2017, filed January 19, 2018), wherein the trial court determined the charter school had failed to obtain the requisite 1,000 signatures on a petition because the circulator admitted that "he, and not the signers, wrote the date of signing on each line of 26 pages of signatures." *Id.*, slip op. at 5. Citing *Academy of Business* and *Capital Academy* and stressing that the dates on the petition were not entered by the signers,

15

we agreed with the trial court that the signatures were invalid and held that "Section 1717-A(i)(3) of the CSL unambiguously requires the person signing to list the date of signing on the petition." *Id.*, slip op. at 7.

There is no dispute herein that Applicant needed to obtain 1,000 signatures of residents over the age of 18 living in the District. The question is whether Section 1717-A(i)(3) requires that signers must place all the information on the petition in their own hand. As previously stated, when answering this question involving the interpretation of a statute, we must strive "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). When seeking the intention of the General Assembly in enacting a statute, we may make the following presumptions:

> (1) That the General Assembly does not intend a result that is absurd, impossible of execution[,] or unreasonable.
>
> (2) That the General Assembly intends the entire statute to be effective and certain.
>
> (3) That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth.
>
> (4) That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.
>
> (5) That the General Assembly intends to favor the public interest as against any private interest.

Section 1922 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922. *See also Acad. of Bus.*, slip op. at 16-17 n.9.

> [T]wo legal maxims ostensibly apply in these circumstances. First, [u]nder the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters. Second, while we primarily focus on what a statute says, it

16

may at times be equally important to recognize what a statute does not say.

*Mimi Invs., LLC v. Tufano*, 297 A.3d 1272, 1286 n.21 (Pa. 2023) (internal quotation marks and citation omitted).

Relevantly, the plain terms of Section 1717-A(i)(3) require signers of a petition to **include** certain information on the petition. It follows that, instantly, a signer also was responsible for placing or listing "his or her printed name; signature; address, including city, borough[,] or township, with street and number, if any . . . [.]" 24 P.S. § 17-1717-A(i)(3). However, while the signer has the responsibility to "place or list" this information on the petition under the statutory language, Section 1717-A(i)(3), by its terms, does **not specifically prohibit** the signer from authorizing another individual (such as the signature gatherer, family member, or other individual) to "place or list" the information on the petition on behalf of the signer. *Id.*

Mr. Hall explained that the signers would "generally" write their own information on the forms. However, where an individual had a physical disability or requested assistance,

> nine times out of ten what [Mr. Hall or Mr. Jones] would end up having to do is hold the clipboard for them. And [Mr. Hall] would ask them the information and fill in the information outside of their, outside of their [sic] signature; and [they] would annotate it [i]n the margin with an SA. And usually an initial SA symbolizing signature assist or annotated signature assist.

(R.R. at 1886a-87a.) "To the best of [Mr. Hall's and Mr. Jones'] knowledge[,]" all signature assists were labeled as such, although Mr. Hall acknowledged that, on occasion, a signer would take the Petition inside his or her home to obtain other signatures from members of the household, and, due to safety concerns brought

17

about by the COVID-19 pandemic, the men could not follow. (*Id*.) If a signer indicated an intent to sign for a family member, Mr. Hall would inform them they could assist with the address information but could not sign for another person, and they must indicate SA on the Petition. (*Id*. at 1887a-89a.) Since signature assists take additional time, Mr. Hall remembered them more vividly and estimated that about 20-25 of the 1,700 signatures he obtained involved a signature assist. (*Id*. at 1888a.) When asked if other than in those instances where they marked signature assists Mr. Jones or he ever wrote information on the Petition themselves, Mr. Hall responded, "No, we did not." (*Id*. at 1901a-02a.) When asked to provide the trial court with an explanation for some lines on the Petition that the District's handwriting expert indicated appeared to have been written in the same hand, Mr. Hall responded as follows:

> There are some[ ]times where, like I said, a family assist[s], as opposed to the organizer. Where the person had signed and then that [sic] report I went through and did my review and I saw that the signatures were different but the handwriting for the street address might be the same. So it could be as simple as a wife [who] comes to the door and signs a petition for us and maybe asks us can my husband sign and goes in and we don't see what's going on. And he's watching TV and she says, baby, fill this out. He says I'm not filling it out, what do I have to do[?] She says it's about the charter school. We're talking about real life and real time. He signs it, she fills out the rest of the information and brings the clipboard back to us. It could be that way with the position of husband and wife, wife and husband, brother[,] and sister.

> Interesting thing about what we found too was that during [COVID-19], as we kind of did our own signature check through the voter database and things of that nature, that families were moving back in together as well due to the pandemic. And I think that played a, that probably played a part in it as well.

> But like I said, with any survey there is going to be a number of errors and things that are out of your control. And I don't think—it comes

18

with the territory. And I don't think that it is grounds to question the integrity of the process. I think you see the integrity of a process, of a petition campaign when you see the addresses run in succession. You can tell that petitioners have gone door to door. If you know what to look for you can tell what days and what areas they were in. And if you really wanted to you could go back to those people on that block and say hey, do you remember. They will tell you I don't remember what day but yeah, we all signed.

You could tell if they were public events. Signatures don't lie. The data doesn't lie. And what goes in the wash comes out in the rinse. As long as you put good things in the wash, the rinse is going to come out clean.

(*Id*. at 1902a-03a.)

Mr. Hall subsequently clarified that of the 1,675 signatures he and Mr. Jones had obtained, 29 required signature assists, and they had used signature assists in every signature campaign they ran. (*Id*. at 1932a-35a.) Mr. Hall was not aware of any instance wherein either he or Mr. Jones assisted a signer but did not mark "S.A." or "signature assist" on the signature line. (*Id*. at 1936a-37a.) In an effort to be "totally transparent" and admitting he and Mr. Jones are not "perfect," Mr. Hall explained that there are sometimes errors with every signature campaign but such errors would affect no more than "a few to a handful, if at all" in the Petition. (*Id*. at 1937a-38a, 1943a.)

Following our review of the foregoing testimony, which the trial court credited, in light of the applicable case law, we find no abuse of discretion in the trial court's determination that the 29 labeled signature assists do not render the entire Petition void. First, as stated above, Section 1717-A(i)(3) does not expressly prohibit a signer from delegating to another individual his or her responsibility to "place or list" that information on the petition. The ability to delegate this responsibility also furthers the CSL's requirement in Section 1717-A(e)(2)(i) for an

19

applicant to show that the charter school enjoys reasonably sufficient support from the community by allowing those who may not otherwise be able to physically complete a petition to have their voices heard. Moreover, there is no evidence that the number of signature assists on the Petition was not ascertainable or unauthorized. Mr. Hall clarified his earlier testimony and revealed that signature assists occurred on only 29 occasions. Contrary to the District's arguments, the testimony did not show that an unknown number of family-assisted signatures had occurred. Rather, the record included an imagining of how a particular signature line could have been completed by different people outside Mr. Hall's presence. Under either circumstance, there was no evidence that these assists were done without the authorization of the signer, to perpetuate fraud, or to otherwise allow unauthorized individuals to sign the Petition, which would require questioning of the veracity of the entire Petition. Therefore, as the trial court found, the entire Petition should not be rendered void based on the use of signature assists.[5]

### C. Whether the Trial Court Erred in Allowing Addresses Containing Abbreviations, Misspellings of Street Names, and Missing Street Directionals.

#### 1. Parties' Arguments

The District challenges the validity of 77 signatures on the grounds that they are accompanied by addresses containing misspellings or lacking street directionals. The District stresses that the CSL requires signatures to correspond with addresses that are "correctly stated," and this "requirement cannot be overlooked as a 'mere technicality'" as the trial court did when relying on a "lifetime of experience in the Norristown community" to discern the challenged addresses. (District's Br. at 37-

---

[5] Further, as Applicant notes, the alleged assisted signatures were excluded from the Petition's count. (Applicant's Br. at 40, 47; Memorandum Order at 25-26.)

20

39.) The District argues the court's personal experience is irrelevant and should not have been considered in determining the Petition's sufficiency, as it is not a part of the record, and constitutes an abuse of the trial court's discretion. (*Id.* at 39-40.) The District also contends that despite the trial court essentially ruling on the record that 77 signatures were not "correct" due to 50 addresses containing misspellings and 27 lacking directionals, the trial court nevertheless found that Applicant had presented 1,041 valid signatures in the Petition, inclusive of those 77 signatures. (*Id.* at 43.) Therefore, relying on cases interpreting and applying the Pennsylvania Election Code (Election Code)[6] to signature line challenges, the District posits the trial court committed an error of law, and those erroneous signatures should be removed, leaving Applicant a dearth of signatures to proceed before the CAB. (*Id.* at 27-36, 38-39.)

Applicant argues that, as the trial court found, the District's challenges to 50 signatures because terms like, for example, "Norristown," "George," "Willow," and "Stanbridge" Streets were misspelled, such that stated addresses were not located in the District, were "frivolous" and "argue[] for a level of perfection that has never been required by the CSL or by [the] [c]ourt," which the trial court, drawing on a "lifetime of experience in the Norristown community," properly rejected. (Applicant's Br. at 49-50, 54-55.) Applicant points out that *Capital Academy* did not speak to misspellings of "otherwise identifiable street addresses," but it held that signatures were valid which corresponded to addresses indicated by "ditto marks"; therefore, the District's reliance on that case is misplaced. (*Id.* at 52.) Applicant further stresses the District's own expert report included both the misspelled street names and stated the correct spelling, which illustrates that there was no confusion

---

[6] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

21

regarding what the signers were attempting to convey. (*Id*. at 53-54, 56.) Finally, Applicant asserts that the Election Code cases cited by the District do not control an analysis under the CSL. (*Id.*)

With regard to the District's position that 27 signature lines are invalid because they lack street directionals, Applicant argues that the provided address information sufficiently allowed the District to verify whether signers lived there, as the testimony of Ms. Anne Rohricht, the District's own expert and CFO, and her corresponding report (the Rohricht Report[7]) indicates. (*Id*. at 59-61.) Applicant states that the trial court was permitted to draw upon its own knowledge and common sense in overruling the District's objections to these signatures upon finding that the omission of street directionals did not indicate the addresses were outside of the District. (*Id*. at 61-62.) Applicant argues that where, as here, the absence of a street directional did not detract from the District's ability to verify the signers' addresses, the trial court properly declined to strike those signatures.[8] (*Id.* at 62-64.)

### 2. *Analysis*

Although the District points to cases interpreting the Election Code, those cases are "neither controlling here, nor relevant." *Cap. Acad.*, 934 A.2d at 196. This Court has repeatedly determined that election laws must be strictly enforced to prevent fraud. For this reason, "so-called technicalities of the Election Code are

---

[7] (R.R. at 1305a-1734a.)

[8] In support of this proposition, Applicant cites a decision of the Colorado Supreme Court that interpreted a statute purportedly similar to the CSL, *McClellan v. Meyer*, 900 P.2d 24 (Colo. 1995). Therein, the court found that despite the exclusion of street directionals or apartment numbers, signatures on a petition were valid so long as the information provided by the signers concerning their residence was "sufficient to safeguard the integrity of the petition process," and concluded that the secretary of state "erred in its adoption and application of the perfect match rule which resulted in the disqualification of registered electors who were otherwise qualified." *Id*. at 33.

necessary for the preservation of secrecy and the sanctity of the ballot and must therefore be observed—particularly where [] they are designed to reduce fraud." *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election*, 843 A.2d 1223, 1234 (Pa. 2004). The CSL applies here, and the salient purpose of the address requirements in the CSL is to provide information that would allow the signer's residency in the District to be determined. *Acad. of Bus.*, slip op. at 18. Pursuant to Section 1717-A(i)(3), "[e]ach person signing a petition to appeal denial of a charter . . . **shall include** his or her . . . address, including city, borough[,] or township, with street and number, if any[.]" 24 P.S. § 17-1717-A(i)(3) (emphasis added). By its terms, this section does not require the signer's address to be **perfectly** transcribed or impose consequences, like invalidation of a signature, where the signature is accompanied by a partially incomplete or misspelled address. Furthermore, when interpreting this provision, this Court has held that where "[n]o fraud or deceit was alleged against [the charter school,]" lines containing "ditto marks" to indicate either a "prior address or date" were considered complete and valid. *Cap. Acad.*, 934 A.2d at 196. The District has not asserted allegations of fraud or deceit on the part of Applicant for submitting signatures with imperfect addresses, nor has it shown that, other than the signature assists, the misspelled addresses or lacking street directionals were written by anyone other than the signer.

The trial court determined that despite misspellings or lack of street directionals, where the address was discernible, the signatures associated with them on the Petition were valid. We discern no abuse of this discretion in this determination. In fact, it is in line with our holding in *Capital Academy* where **no attempt at all** was made to spell a street name or indicate a date on the part of a signer who used "ditto marks" as a substitute for that required information. 934

23

A.2d at 196. Applying this rationale herein, we hold that as long as the misspelling or missing directional in an address on the Petition was not so deficient as to preclude an understanding of the location, that address is not so deficient as to require the striking of the signature.

At the outset of the hearing on the motion *in limine*, the trial court heard argument pertaining to 89 signatures[9] the District had challenged on this basis. (R.R. at 1736a-58a.) While the trial court noted that some addresses were "brutally misspelled" to the point where they could not be determined, the court, having lived in Norristown for nearly 30 years, explained it was not concerned about minor misspellings. (*Id*. at 1748a-49a.) Notwithstanding, the trial court indicated that "it's what [the court is] going to hear from the witness stand that's going to be important." (*Id*. at 1752a.) Thereafter, the District presented the testimony of Ms. Rohricht who went through the challenged signatures and noted, for example, misspellings like "Geoge Street" or "Gerors Street" were listed instead of "George Street." The trial court remarked that the spelling of addresses listed both immediately before and after some of these in the Petition was correct. (*Id*. at 1759a-62a.) After additional addresses were called into question due to spelling errors, the trial court acknowledged some were more egregious than others but pointed out that Norristown is "a diverse community and you're going to have people that don't know how to spell. It doesn't mean they're trying to commit a fraud or they're trying to deceive anyone. It's just part of the community you're going to be dealing with." (*Id*. at 1669-70a.) Despite the misspellings, the trial court questioned "[h]ow could

---

[9] The trial court sustained four of these objections, which would seem to leave 85 for the District to challenge. However, the District asserts in its brief that the trial court erroneously found 77 signatures to be valid despite errors associated with addresses. The result would be the same even if the District were to have challenged the additional eight signatures.

anybody possibly think they meant some place other than Norristown[.]" (*Id.* at 1786a.) The trial court added:

> [The District is] complaining it's []an E-L-L instead of an A-L-L. It is. It's correct. I mean, it is what it is. I mean, you got to consider the type of community that Norristown is and I don't think we require perfection. I know I certainly don't. I'm not having any problems with the majority of these. I think I—they had me thoroughly confused with the Rosemont address and street number and the Penn Street thing. I have no idea what those two were. I had problems with two of the Stanbridge addresses. Other than that, I, myself, haven't had any problems with these for the reasons I stated on the record.
>
> Now, if the appellate courts are going to say, no, we insist on perfection. I don't know how you can throw somebody out the window that spelled Norristown incorrectly because they left out an I or left off the N. You know, if they say you can, you can. I won't.

(*Id.* at 1805a-06a.) When ruling on the objections on the basis of misspellings and abbreviations, the trial court further stated the following:

> I don't think you can have perfection from everyone, especially the Norristown community. I think there are times they're going to spell words and they're going to spell them phonetically. I'm not at all impressed with the objections to the way Norristown was misspelled. Clearly, we were always talking about Norristown.
>
> I do think the one Rosemont objection and the Penn Street objection are valid objections. I couldn't discern Penn from the way that was written.
>
> I have 774 Fornance Street objected to. I'll sustain that objection. And whatever 177, line 3 was, I think that was to Airy Street, that's four objections I'll sustain the objection to those four.
>
> I understand some people in Norristown say Furnace Street instead of Fornance Street. I don't think there's any deception there. I grant there's no perfection—there's no—it's not perfect; and if that's what the appellate courts want, they can say so. But I'm satisfied with my rulings and I'll sustain those four objections to those.

25

(*Id.* at 1824a-25a.)  The trial court also granted an additional objection to "Natale Street."  (*Id.* at 1827a.)

Turning to the District's challenges to addresses lacking street directionals, like "East" or "West," which the parties agreed were 27, Ms. Rohricht stressed that although the addresses at issue are located within the District, "from the [] District's perspective, the signs really make a difference" as they can affect where a child who rides a school bus is dropped off or "potentially mean the difference between attendance in one school or another because our boundaries are driven by streets." (*Id.* at 1829a-30a, 1832a, 1834a.)  Ms. Rohricht explained that although an address lacking a directional "would be an initial problem," the District "would reach out to [a] registrant to determine the correct address" and would "enroll that child as long as they lived in the [D]istrict[.]"  (*Id.* at 1849a-50a.)  In fact, the Rohricht Report repeatedly indicated the correct spelling, or suggested the correct spelling or missing directional for addresses containing errors in that regard.  (R.R. at 1305a-32a.)  But for one address which it deemed the District had proven did not exist, the trial court did not disqualify any other signatures on the Petition associated with addresses for lack of directionals.  (*Id.* at 1850a.)

The District is correct that "[a] trial court may not consider evidence outside of the record in making its determination[,] [n]or may [an appellate court] uphold a trial court's order on the basis of off-the-record facts." *Ney v. Ney*, 917 A.2d 863, 866 (Pa. Super. 2007) (citations omitted).[10]  Trial court decisions have been overturned where "the orders at issue were based on the consideration of evidence outside the record, *and* because the parties had no notice of, or opportunity to

---

[10] It is well settled that this Court may cite Superior Court cases for their persuasive value. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 n.20 (Pa. Cmwlth. 2021).

26

respond to, the same." *Commonwealth v. Hoover*, 231 A.3d 785, 793 (Pa. 2020) (emphasis in original). It is true that in its Memorandum Order, the trial court incorporated personal anecdotes throughout its analysis of the District's address challenges. For example, the court explained that "with a lifetime of experience in the Norristown community, [it] was able to draw upon that experience and knowledge base of that community's demographics in reviewing and overruling [objections based upon misspellings or abbreviations in addresses]." (Memorandum Order at 15.) With regard to missing directionals in addresses, the trial court also observed that

> [a]s a young boy growing up in Norristown[,] no street sign contained a directional. Everyone knew if you travelled North on Powell and Swede [S]treets all the streets to the right were designated "East" and all streets to the left were designated "West[.]"[] Today[,] some blocks on some streets do contain a directional. The vast majority however do not. Today, the block I grew up on, East Freedly Street, does not have a directional on the street sign. The fact alone that a signatory does not include a directional on the street address should not disqualify the signature.

(*Id.* at 17-18.) However, after its review of the Rohricht Report, the trial court also explained that the objections identified in the Rohricht Report were not "based upon any genuine confusion or uncertainty regarding the address the signer intended to convey," as the correct address was then identified in that report. (Memorandum Order at 14.) Thus, the trial court found that **based on the evidence presented**, the District clearly understood what the majority of the challenged addresses intended to convey making them sufficient under the CSL. (*Id.* at 16.) *See also Cap. Acad.*, 934 A.2d at 196 (holding that signatures on a charter school appeal petition which included "ditto marks" in place of a complete address were not rendered invalid under Section 1717-A(i)(3) of the CSL where the school district did not allege that

the charter school was engaging in fraud or deceit and the testimony revealed that the school district knew what the "ditto marks" indicated); *Acad. of Bus.*, slip op. at 18 (reiterating a signature on a charter school appeal petition is not invalid under Section 1717-A(i)(3) "when a signer includes 'ditto marks' on the petition instead of his or her complete address because no fraud or deceit was alleged against the charter school and the testimony showed that school district understood what the ditto marks were intended to convey").

To be clear, the trial court's *sua sponte* expression of its personal observations and experiences gleaned from having lived in Norristown is irrelevant to its legal determination that perfect spelling and directionals in addresses accompanying signatures on the Petition were unnecessary. Notwithstanding, when its comments are read in the context of the hearing transcripts and the Memorandum Order as a whole, we do not find the trial court's reliance thereon rises to an abuse of discretion. Rather, the trial court ultimately based its decision on its reading of the CSL and the evidence of record. Thus, to the extent the comments may have exceeded judicial discretion, they were harmless and did not constitute reversible error.

In sum, where an address was ascertainable despite the misspelling or lack of directional notation and it was within the District, the trial court found the signature to be valid. Ms. Rohricht's testimony and her corresponding Rohricht Report reflected that the District could discern the meaning of the misspelled words. Thus, although the 77 addresses the District challenges were not perfect, its own witness established they were sufficient under the CSL. Accordingly, there is no error or abuse of discretion in the trial court's accepting those signatures as valid.

28

*D. Validity of Signatures Accompanied by Affidavits from Non-Resident Affiants.*

### *1. Parties' Arguments*

Again relying on *Academy of Business*, the District argues that all of the signatures on the Petition were not verified by a proper affiant and, therefore, the Petition is void in its entirety. The District contends that Section 1717-A(i)(4) of the CSL requires, *inter alia*, that the affiant must be a resident of the school district, and that the affidavits of Messrs. Jones and Hall, non-residents of the District, were affixed to the end of each page of the Petition. (District's Br. at 41-42.)

In response, Applicant states that, in accordance with Section 1717-A(i)(4), it attached an affidavit from Ms. Maguire, a District resident, which, pursuant to her testimony, covered all signatures gathered through October 16, 2020, the last day of the signature period, a fact the District fails to acknowledge. (Applicant's Br. at 65-69.) According to Applicant, the affidavits of Messrs. Jones and Hall were extraneous, and if the General Assembly had intended to prohibit the attachment of additional affidavits along with the required one, it would have specified as much. (*Id.* at 69-71.) Therefore, Applicant asserts, the inclusion of additional affidavits does not invalidate that completed by Ms. Maguire. (*Id.*)

### 2. *Analysis*

Section 1717-A(i)(4) of the CSL requires that:

(4) Each petition shall have appended thereto the affidavit of some person, not necessarily a signer, setting forth all of the following:

(i) That the affiant is a resident of the school district referred to in the petition.

29

(ii) The affiant's residence, giving city, borough[,] or township, with street and number, if any.

(iii) That the signers signed with full knowledge of the purpose of the petition.

(iv) That the signers' respective residences are correctly stated in the petition.

(v) That the signers all reside in the school district.

(vi) That each signer signed on the date set forth opposite the signer's name.

(vii) That to the best of the affiant's knowledge and belief, the signers are residents of the school district.

24 P.S. § 17-1717-A(i)(4).

Without acknowledging that Applicant attached an affidavit from Ms. Maguire, the District challenges the entire Petition because Messrs. Hall and Jones, who are not residents of the District, also attached affidavits in support of the signatures they collected. However, while Section 1717-A(i)(4) requires a resident affidavit, it does not specifically prohibit an applicant from attaching **additional** affidavits of non-residents personally involved in the signature gathering process, as Applicant did herein.

In *Academy of Business*, this Court concluded that the trial court had not erred in striking all the signatures on the pages for which a non-resident had served as an affiant. *Id.*, slip op. at 21. However, unlike the matter sub judice, the affiant held himself out as a resident of the school district and had completed his affidavit pursuant to Section 1717-A(i)(4). *Id.*, slip op. at 19-21. To the contrary, although Messrs. Hall and Jones presented affidavits associated with the signatures they gathered on the Petition, they sought Ms. Maguire to serve as the resident affiant.

30

Thus, their affidavits are extraneous, and while Section 1717-A(i)(4) prescribes the contents of a resident affidavit, it does not prohibit the inclusion of additional affidavits or otherwise indicate that such additional affidavits, if completed by non-residents, will negate that of a resident affiant. Thus, *Academy of Business* is not dispositive on this issue, and we next consider whether Ms. Maguire's affidavit satisfies the requirements of Section 1717-A(i)(4).

Mr. Hall testified that one of the few restaurants that remained opened during the time he and Mr. Jones were gathering signatures was Alfredo's Restaurant (Alfredo's), which is located in the District, and the men chose that establishment as a meeting place each day. (R.R. at 1892a.) Ms. Maguire, a server at Alfredo's who lives above the establishment, expressed interest in Applicant's mission and became the community sponsor early on in the effort and would do daily signature reviews with them. (R.R. at 1892a-93a, 1896a-98a.)

Ms. Maguire testified that in 2020 she lived on Hamilton Street in Norristown, and, in fact, she had lived in Norristown her entire life. (N.T. February 23, 2023 Hearing (N.T. February) at 5.)[11] Messrs. Hall and Jones told her they needed a community sponsor to assist them with the Petition. Ms. Maguire understood this position would require weekly meetings at which time she would suggest areas in the District for canvassing and review the signatures on the Petition to ensure they were signed on a given date, that the addresses were valid and located within the District, and that the signers understood the significance of their signatures. (*Id*. at 7-10, 14-15, 19.) Ms. Maguire observed Messrs. Hall and Jones interact with patrons in Alfredo's in their effort to obtain signatures. (*Id*. at 9, 11.) Ms. Maguire was

---

[11] As the notes of testimony for February 23, 2023, had not been prepared before the District compiled the Reproduced Record, we cite only to the notes of testimony obtained from the original record.

31

aware that she would eventually need to sign a resident affidavit indicating that she was the community sponsor and attesting to her efforts; she did so on October 16, 2020, the last day for obtaining signatures, which she intended as verification of all the signatures obtained through that date. (*Id*. at 10, 13, 15; R.R. at 1896a-99a.)

Following Ms. Maguire's testimony, the District argued that Ms. Maguire's affidavit did

> not properly apply [to] all of the signatures. As we've argued, the signatures are riddled with all kinds of problems, misspellings, [and] inaccuracies, and of course we have the issue of the signature assist, which the parties have been madly briefing to you. Our objections remain, Your Honor.

(*Id*. at 22-23.) Presently, the District also argues that because each of the 193 signature pages Applicant submitted has an **additional** affidavit attached and signed by a non-resident, all of the signatures in the Petition are invalid.[12] In doing so, the District does not acknowledge Ms. Maguire's affidavit which Applicant appended to the Petition. Ms. Maguire's testimony established that she, as a resident of the District, sought to ensure throughout the signature gathering process that to the best of her knowledge, the signers of the Petition were residents of the District. Ms. Maguire explained she executed and dated her affidavit with full knowledge of its purpose as is required by Section 1717-A(i)(4) of the CSL. (N.T. February at 5-19.) The trial court found Ms. Maguire's testimony "unequivocally" established that "when she signed her October 16, 2020 affidavit, she intended that it applied to all signatures [Messrs. Hall and Jones] had [ ] gathered as of that date." (Memorandum

---

[12] These affidavits were executed from September 2020 through December 1, 2020, and correspond with the signatures on each page of the Petition. Although Mr. Hall omitted on several affidavits to indicate he was not a resident of the District, on the majority of their respective affidavits he and Mr. Jones crossed off the notation that they are residents of the District and replaced it with a handwritten notation of "State of Pa." (R.R. at 217a-593a, 751a-1135a.)

Order at 32; N.T. February at 15.) "It is beyond peradventure that the trial court, sitting as the fact-finder, is free to believe all, part or none of the evidence, to make all credibility determinations, and to resolve all conflicts in the evidence." *In re Appeal of the Bd. of Auditors of McKean Twp./2017 Meeting*, 201 A.3d 252, 262 (Pa. Cmwlth. 2018) (citation omitted). We will not reweigh the evidence and make credibility findings different than those of the trial court, which is beyond this Court's standard of review. *Id.* at 263.

Ms. Maguire's affidavit attests that she resides at, "324 Hamilton St. 2nd Flr., Norristown[,] Pa[.]"; that she signed with "full knowledge of the purpose of [the] [P]etition"; that the "signers' respective residences are correctly stated in the [P]etition"; that "signers all reside in the [] District"; that "each signer signed on the date set forth opposite the signer's name"; and "to the best of [Ms. Maguire's] knowledge and belief, the signers are residents of the [] District." (Supplemental R.R. at 34b.) Moreover, Ms. Maguire executed her affidavit on October 16, 2020, with the benefit of her own observations of the manner in which Messrs. Hall and Jones obtained signatures from patrons at Alfredo's and her weekly signature reviews with them. (N.T. February at 8-13.) This involvement **exceeds** the requirements of the CSL, for, thereunder, the resident affiant does not need to have personally obtained signatures as "a lay person under the CSL does not have to execute an affidavit upon personal knowledge, so long as the affiant relied on reasonable information or belief in completing the affidavit." *Cap. Acad.*, 934 A.2d at 195. The trial court found Ms. Maguire's affidavit sufficient under this standard and that finding is supported. For these reasons, we discern no error or abuse of discretion in the trial court not rejecting the Petition in its entirety on this basis.

## III.    CONCLUSION

Finding our analysis in *Academy of Business* persuasive and applicable herein, we hold the trial court's June 26, 2023 Memorandum Order was final and appealable and deny Applicant's Application to Quash.  We also hold that signers who are required to include certain necessary information in a charter school petition are not prohibited from permitting another to assist them under Section 1717-A(i)(3) of the CSL and that same section does not require striking signatures associated with addresses that are misspelled or missing a directional notation so long as the location is discernible from the information included and no fraud or deceit is established.  Following our review, we conclude the record evidence supports the trial court's findings that the signature assists herein were not unknowable so as to render the entire Petition invalid, and the 77 challenged signatures were not so deficient so as to render them invalid.  We further find that although the trial court's personal observations of and commentary pertaining to the Norristown area made on the record and in its Memorandum Order were irrelevant and unnecessary for a legal determination, its ultimate holding is supported by the record evidence.  Finally, we conclude that Section 1717-A(i)(4) does not require the voiding of an entire petition accompanied by a proper resident affidavit where the petition also is accompanied by extraneous affidavits of non-residents.  For these reasons, we affirm.

_____
**RENÉE COHN JUBELIRER,** President Judge

34

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Norristown Academy Charter School    :
   :
   :
   :
         v.             :   No. 745 C.D. 2023
   :
Norristown Area School District,    :
            Appellant    :

## **O R D E R**

**NOW**, November 17, 2023, the Application for Post-Submission Communication (Application) filed by Norristown Academy Charter School, to which Norristown Area School District is opposed, is **GRANTED**, and the Post-Submission Memorandum attached to the Application is accepted. Norristown Academy Charter School's Application to Quash Appeal filed on July 18, 2023, is **DENIED**. The Memorandum Order of the Court of Common Pleas of Montgomery County filed on June 26, 2023, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge